IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **SHANE CLARK,** | § § § | |
| *Plaintiff*, | § § | CIVIL ACTION NO. |
| v. | § § | 4:21-cv-90 |
| | § | ECF |
| **GE PRECISION HEALTHCARE, LLC,** | § § § | |
| *Defendant.* | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND**

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

Shane Clark sues GE Precision Healthcare for discrimination on the basis of his status in the United States Air Force Reserve, in violation of USERRA. Mr. Clark was a Project Manager for GE Precision Healthcare with no performance or disciplinary issues. On the contrary, he had numerous accolades since he started in 2014, and had been on track to assuming a leadership role prior to his termination. Unfortunately, GE Precision Healthcare resented Mr. Clark's involvement in the reserves. In 2015, a prior supervisor complained to Mr. Clark specifically about his reserve duties and demanded to speak to his commanding officer. That supervisor was later replaced by a more sympathetic supervisor named Joanne Scott. Mr. Clark was later activated and out of work on reserve duties between April 2019 and January 2020. When he returned, everything changed. Multiple coworkers treated him differently or even complained that he had been gone for so long because of his reserve duties. One coworker specifically told him that Ms. Scott had taken heat for

keeping him on the payroll. Sure enough, when Ms. Scott was replaced in March or April 2020 by Roberto Castro, soon thereafter Mr. Clark was told he was being laid off. Mr. Castro's only explanation was that it was a "business decision." Mr. Clark was the only reservist under Mr. Castro and one of only two Project Managers in the entire company to be laid off, although multiple other Project Managers under Mr. Castro were new hires. After Mr. Clark's termination, for the first time GE Precision Healthcare represented that Mr. Clark had been let go because of his performance alone, and specifically because of some issue with his backlog, or orders in the pipeline. This is pretextual for several reasons, including that:

- Mr. Clark had never before been told there were problems with his backlog;
- Mr. Clark had neither the largest nor the smallest backlog of the Project Managers under Mr. Castro;
- Mr. Castro had the authority to assign or take away orders from Mr. Clark, but he did not restore the orders Mr. Clark had before his activation; and
- Over the 16 months prior to Mr. Clark's activation, he closed more projects than any other Project Manager under Mr. Castro and brought in more than his share of revenue for the Dallas team.

In reality, Mr. Clark was fired because GE Precision Healthcare did not want to keep a Project Manager who had obligations to the United States military, violating USERRA.

## I. PARTIES, JURISDICTION, AND VENUE

1. Plaintiff, Shane Clark, is an individual who resides in Tarrant County, TX
2. GE Precision Healthcare is a Delaware company with its principal place of business in Wisconsin. It may be served through its registered agent for service of process in Texas, CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201.

3. Personal jurisdiction over GE Precision Healthcare is appropriate because at all times relevant to Plaintiff's claims, it was doing business in the State of Texas as defined by the Texas Long Arm Statute, including in Tarrant County, where Plaintiff worked from home. Further, an exercise of jurisdiction will not offend traditional notions of fair play and substantial justice.

4. GE Precision Healthcare is an employer within the meaning of the Uniformed Services Employment and Reemployment Rights Act ("USERRA").

5. This Court has jurisdiction to hear the merits of Plaintiff's USERRA claims under 28 U.S.C. § 1331. Venue is proper in the district and division under 28 U.S.C. § 1391(b).

## II.  FACTUAL BACKGROUND

6. Shane Clark first began to work for an affiliate company, GE Transportation, in January 2012, as part of a leadership program.

7. By around April 2014, he transferred to work for GE Precision Healthcare, where he became a Project Manager.

8. In that capacity, Mr. Clark provided end-to-end support to customers generating sales, and ensuring customers received the machinery they ordered and were able to get it up and running.

9. Prior to his termination, Mr. Clark had no disciplinary history or negative performance reviews.

10. Mr. Clark consistently received positive feedback from customers throughout his tenure.

11. As recently as the first quarter of 2020, Mr. Clark received written recognition from GE Precision Healthcare in the form of an OTI ("On Time to Install") Award.

12. Before that, Mr. Clark received frequent written recognition for his excellent performance, including from supervisors like Director of Project Management Joanne Scott and her supervisor, Senior Director of Project Management Kim Horn.

13. Mr. Clark has been a member of the U.S. Air Force Reserve since 2012, and notified GE that he was in the reserves shortly after he began his job.

14. After his transfer to GE Precision Healthcare, Mr. Clark was the only Project Manager on the Dallas team of Project Managers who was a reservist.

15. To the best of his knowledge, Mr. Clark is the only Project Manager who is a reservist in the entirety of the company's Digital Imaging Division.

16. Through 2015, Mr. Clark was out approximately one week a quarter because of his obligations to the Air Force Reserve.

17. In October 2015, Mr. Clark's supervisor at the time, Deependra Gangakhedkar, called and complained to him about being gone too much on reserve duties, and also demanded to speak to Mr. Clark's commanding officer.

18. Mr. Clark reported these comments to HR employee Danielle Maas on October 24, 2015.

19. As a result, Mr. Gangakhedkar was counseled.

20. By on or about January 2016, Ms. Scott became Mr. Clark's supervisor.

21. Ms. Scott's son was in the military, and she was quite supportive of Mr. Clark's reserve obligations.

22. In December 2018, Mr. Clark was nominated for GE's Building Essential Leadership Skills ("BELS") course, and attended the course in March 2019.

23. Only high-performing individuals who are seen as likely to be moving up to supervisory positions are nominated for a BELS course.

24. In April 2019, Mr. Clark was brought onto active duty with the military and called up for re-training.

25. Mr. Clark had previously been notified this was going to happen in 2019 and had told Ms.

Scott as much in or about April 2018.

26. Between April 2019 and January 2020, Mr. Clark was out of work while performing his reserve duties.

27. During his activation, Mr. Clark kept Ms. Scott informed of his expectations that he would return in early 2020.

28. About a month prior to Mr. Clark's return, he notified Ms. Scott of his precise return date.

29. When Mr. Clark actually returned, however, he noticed that a number of employees, including Project Quality Leader Mike Aurelia, seemed much colder toward him and less willing to help him.

30. Mr. Aurelia seemed surprised Mr. Clark was still employed.

31. Mr. Aurelia's job duties included training employees on new technologies, and Mr. Aurelia simply never bothered to train Mr. Clark on the changes that had taken place after he left.

32. Around February 2020, Installation Modality Leader Chris Gray told Mr. Clark that his supervisor Ms. Scott had "received heat for keeping you on."

33. Mr. Gray confirmed that the sales team had complained about Mr. Clark's absence.

34. Later in or about March 2020, Vascular Sales Manager Robert Wheeler complained to Mr. Clark that him being gone on reserve duties was "difficult" for the company, though he added "it's not your fault, that's management's problem."

35. In or about March or April 2020, Ms. Scott retired, and Roberto Castro replaced Ms. Scott as Mr. Clark's supervisor.

36. After Mr. Clark returned, and up until the date he was notified of his termination, no one at GE Precision Healthcare—including Ms. Scott and Mr. Castro—ever told Mr. Clark that they were dissatisfied with his performance or that any of his performance metrics were off.

37. In April 2020, Mr. Clark received a 2.5 percent raise.

38. Mr. Clark discussed his raise with other Project Managers on the Dallas team, and all the others who were willing to tell him a number told Mr. Clark they had earned raises of 3 percent or greater.

39. On May 13, 2020, Mr. Castro and HR employee Kara Schuff informed Mr. Clark he was being laid off due to a reduction in force, effective June 13, 2020.

40. The only verbal explanation Mr. Castro gave for the decision was that it was a "business decision."

41. Mr. Clark specifically told Mr. Castro that he was protected under USERRA, but Mr. Castro dismissed that issue.

42. Mr. Clark was given OWBPA disclosures at this termination which stated that: "Decisions as to which employees in the Decisional Unit were selected for layoff were made based on a number of factors. For example, certain functions or positions were selected for elimination based on an assessment of whether they are or will be redundant in the restructured organization. In addition, where there was more than one incumbent in a position selected for elimination, individuals were selected for layoff based on factors including performance, experience, skills and abilities, and how the various positions and employees mapped to business needs and specific jobs in the restructured organization."

43. The OWBPA disclosures also indicated that only two Project Managers were let go, out of a total of 122 in the company.

44. Mr. Castro managed eleven Project Managers including Mr. Clark, and at least four of them had started after Mr. Clark.

45. For instance, Ben Randall was hired just as Mr. Clark went on his deployment in April 2019,

and Mr. Clark trained him.

46. Furthermore, a new Project Manager, Roy Limas, had just been added to Mr. Castro's team in or around March 2020 and had not even been assigned any projects.

47. However, the only other Project Manager to be let go was not on the Dallas Team or under Mr. Castro.

48. About a week after notifying Mr. Clark of his termination, Mr. Castro made a number of comments to Mr. Clark about how his military training would help his job search.

49. In a subsequent letter to Mr. Clark's counsel, GE Precision Healthcare's counsel stated that: "Given a decrease in customer orders, the business determined it needed to eliminate one Project Manager role in this region. In making the decision of which Project Manager to impact, the business looked at each Project Manager's backlog, or orders in their pipeline. Mr. Clark covers North Texas, which has seen the greatest impact to orders and therefore, his role was eliminated."

50. It was unclear from this explanation if GE Precision Healthcare's position was that Mr. Clark had too much of a backlog or not enough of one.

51. Either way, this explanation is false.

52. At the time he was notified of his layoff, Mr. Clark had neither the most nor the least orders in the pipeline of any of the Project Managers under Mr. Castro.

53. Neither Mr. Castro nor anyone else at the company ever told Mr. Clark prior to his termination that there was a problem with his backlog.

54. Furthermore, Mr. Castro had the authority to assign or move Mr. Clark's orders and change his backlog.

55. After Mr. Clark returned from his reserve duties, he was never fully re-assigned his old

projects, although many were still ongoing.

56. Over the 16 months prior to April 2019, Mr. Clark had completed 93 projects, the most of any Project Manager in the DFW area.

57. Over that time, Mr. Clark accounted for 23.46 percent of revenue brought in by the Dallas team, despite accounting for only 20 percent of the team.

58. The real reason Mr. Clark was fired was because of his status in the U.S. Airforce Reserve.

### III.   DISCRIMINATION IN VIOLATION OF USERRA

59. Mr. Clark re-alleges and incorporates the allegations contained in the above paragraphs as if fully stated herein.

60. Mr. Clark had an obligation to perform service in a uniformed service and did in fact do so with GE Precision Healthcare's knowledge, including from April 2019 to January 2020.

61. Mr. Clark suffered adverse employment actions, including a lower raise than similarly situated non-reservist employees, and termination.

62. Mr. Clark suffered those adverse actions because of his obligation to perform service in a uniformed service.

63. GE Precision Healthcare's actions violate the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4311, *et seq*.

64. Defendant's unlawful discrimination has caused Mr. Clark to suffer a loss of pay, benefits, and prestige for which he is entitled to damages.

65. Defendant's actions have caused Mr. Clark to suffer mental and emotional distress, entitling him to compensatory damages.

66. Defendant has engaged in unlawful discriminatory practices with malice and reckless indifference to Mr. Clark's statutorily protected rights, thereby entitling him to punitive damages.

67. To redress the injuries Mr. Clark has sustained as a result of Defendant's unlawful discriminatory practices, he has retained the undersigned counsel to represent them and seeks recovery of reasonable attorneys' fees, experts' fees, and costs.

## IV.   JURY DEMAND

68. Plaintiff hereby makes a demand for a trial by jury on all issues, claims and defenses in this action.

## V.   PRAYER

69. Plaintiff Shane Clark respectfully requests that the above-named Defendant be cited to appear in this matter and that, after jury trial by proof, he be awarded:

   i.   Back pay, including but not limited to, lost wages (salary and commissions), and other employment benefits;

   ii.  Reinstatement to Plaintiff's position of employment, equivalent position of employment, or the position of employment Plaintiff would have enjoyed but for the discrimination and retaliation;

   iii. In the event that reinstatement is not feasible, front pay with respect to all pay and benefits Plaintiff would have received but for termination;

    iv.    Judgment against Defendant for compensatory damages including emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life;

    v.    Actual damages;

    vi.    Punitive damages;

    vii.    Exemplary or liquidated damages;

    viii.    Judgment against Defendant for Plaintiff's reasonable attorneys' and experts' fees; and costs of suit;

    ix.    Prejudgment and post-judgment interest as allowed by law; and

    x.    Such other and further legal and/or equitable relief to which Plaintiff may be justly entitled.

Respectfully submitted,

ROB WILEY, P.C.

By: */s/ Austin P. Campbell*

Robert J. Wiley
Texas Bar No. 24013750
rwiley@robwiley.com
*Board Certified Specialist, Texas Board of Legal Specialization, Labor and Employment Law*

Austin P. Campbell
Texas Bar No. 24103768
acampbell@robwiley.com

LAW OFFICE OF ROB WILEY, P.C.
2613 Thomas Avenue
Dallas, Texas 75204
Telephone: (214) 528-6500
Facsimile: (214) 528-6511

ATTORNEYS FOR PLAINTIFF